Thomas D. ARTHUR, Plaintiff-Appellant,

v.

COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS, Anne Adams Hill, General Counsel, Alabama Department of Corrections, in her official capacity, Holman CF Warden, Defendants-Appellees.

No. 17-11879-P
Non-Argument Calendar

United States Court of Appeals, Eleventh Circuit.

(May 24, 2017)

896

Suhana Han, Adam Brebner, Akash M. Toprani, Sullivan & Cromwell, LLP, New York, NY, Christine A. Freeman, John Anthony Palombi, Federal Defender Program, Inc., Montgomery, AL, for Plaintiff-Appellant

Thomas R. Govan, Jr., James Clayton Crenshaw, James Roy Houts, Lauren Ashley Simpson, Alabama Attorney General's Office, Steven Marshall, Attorney General's Office, Montgomery, AL, for Defendants-Appellees

Before HULL, MARCUS, and WILSON, Circuit Judges.

HULL, Circuit Judge:

Under sentence of death, Thomas Arthur's execution is currently scheduled for May 25, 2017 at 6:00 p.m. CST. This is Arthur's eighth scheduled execution[1] and sixth 42 U.S.C. § 1983 case.[2]

A 2012 regulation of the Alabama Department of Corrections ("ADOC") prohibits visitors having cell phones in Alabama prisons, and thus Arthur's execution witnesses may not have cell phones within the execution viewing room. In this § 1983 case, Arthur claims that ADOC's 2012 regulation, as applied to his May 25, 2017 execution and as applied to his designated friend-witness, violates his rights to access the courts under the First Amendment in order to raise a future Eighth Amendment claim that may potentially arise during the middle of his execution.

To explain the narrow issue before this Court in Arthur's § 1983 cell phone case,

1. Alabama previously scheduled Arthur's execution for (1) April 27, 2001; (2) September 27, 2007; (3) December 6, 2007; (4) July 31, 2008; (5) March 29, 2012; (6) February 19, 2015; and (7) November 3, 2016. See Arthur v. Comm'r, Ala. Dep't of Corr., 840 F.3d 1268, 1275 n.2 (11th Cir. 2016).

2. Arthur brought three prior § 1983 cases challenging the method of his execution, which will be described further below. In addition, Arthur previously filed two other § 1983 complaints seeking (1) access to physical evidence for DNA testing and (2) an injunction barring a post-mortem autopsy of his body. (CM/ECF for the U.S. Dist. Ct. for the S.D. Ala., case no. 1:08-cv-441, docs. 1, 11,

12; CM/ECF for the U.S. Dist. Ct. for the M.D. Ala., case no. 2:07-cv-319, docs. 1, 14, 15).

During the pendency of this appeal from the United States District Court for the Middle District of Alabama, Arthur also filed a seventh § 1983 case (challenging the use of midazolam) in the United States District Court for the Southern District of Alabama. (CM/ECF for the U.S. Dist. Ct. for the S.D. Ala., case no. 1:17-cv-221, doc. 1). That seventh suit, just filed on May 16, 2017, is also currently before this Court on appeal, and this Court granted Arthur's motion for expedited briefing. (CM/ECF for the Eleventh Cir. Ct. App., case no. 17-12257).

we must first review Alabama Code § 15-18-83, which restricts who may be present and witness an execution in Holman Prison. We then outline (1) Arthur's litigation history from 1992-2006 about his murder conviction and death sentence, (2) his five prior § 1983 cases from 2007-2017, and (3) ADOC's 2012 regulation that prohibits cell phones inside all prisons. This § 1983 case is not about access to a phone in another part of the prison or even outside the execution viewing room. Rather, Arthur's § 1983 complaint addresses only access to a cell phone "in the viewing room" or, alternatively, placement of and unimpeded access to a landline "in the viewing room." [3] But whether the requested telephone is a cell phone or, alternatively, a landline, Arthur has been clear in his complaint and prayer for injunctive relief that his request is for a telephone "in the viewing room." For brevity purposes, we refer to Arthur's request as for a cell phone in the viewing room.

We then discuss (4) in more detail Arthur's § 1983 claim based on the First and Eighth Amendments, (5) the district court's ruling on Arthur's claim for a witness to have a cell phone in the viewing room at his May 25, 2017 execution, and (6) why, on appeal, Arthur has shown no reversible error in the district court's dismissal of this § 1983 case as barred by the statute of limitations, or alternatively for failure to state a claim for injunctive relief.

Importantly, on appeal, Arthur has made no claim under the Sixth or Fourteenth Amendments. Rather, Arthur brings his claims as a First Amendment access-to-courts case.[4]

## I. ALABAMA CODE § 15-18-83: WITNESSES TO EXECUTIONS

We start with the governing Alabama statute. Enacted in 1975, Alabama Code § 15-18-83 explicitly restricts who may be present at an execution. That statute reads in its entirety:

> (a) The following persons may be present at an execution and none other:
>
> (1) The executioner and any persons necessary to assist in conducting the execution.
>
> (2) The Commissioner of Corrections or his or her representative.
>
> (3) Two physicians, including the prison physician.
>
> (4) The spiritual advisor of the condemned.
>
> (5) The chaplain of Holman Prison.
>
> (6) Such newspaper reporters as may be admitted by the warden.
>
> (7) Any of the relatives or friends of the condemned person that he or she may request, not exceeding six in number.

3. Arthur's primary request is to allow his designated witness to have a cell phone "in the viewing room." Arthur has nowhere alleged that ADOC already has an existing landline within the viewing room. Nonetheless, we will construe his claim as requesting access to either a newly installed landline or an existing landline in the viewing room.

4. In his § 1983 right-of-access complaint, Arthur does note that a prisoner's right of access to the courts emanates from the First and Fourteenth Amendments to the United States Constitution. Arthur only cites the Fourteenth Amendment, however, for the proposition that, by operation of that Fourteenth Amendment, the states are precluded from abridging First Amendment rights. See Grosjean v. Am. Press Co., 297 U.S. 233, 243, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936). Arthur asserts no stand-alone Fourteenth Amendment claim in his right-of-access § 1983 complaint. Arthur's claim is a First Amendment access-to-courts claim to assert a future Eighth Amendment claim that may potentially arise during his execution.

(8) The immediate family of the victim, over the age of 19, not exceeding eight in number and apportioned equally among the victim's immediate family members. If there are fewer than six total immediate family members of the deceased victim, additional immediate family members of a victim, for whose death the inmate is not sentenced to death.

(b) No convict shall be permitted by the prison authorities to witness the execution.

Ala. Code § 15-18-83 (1975) (emphasis added). Thus, a condemned inmate can designate up to six "relatives or friends" who may be present at his execution. The statute does not provide an option for the inmate's attorney to be present in his or her capacity as legal counsel. The list is a closed universe—only the people listed "and none other" may witness an execution. Arthur has designated Suhana Han, his attorney, to be one of his six relative or friend-witnesses under § 15-18-83. While Han has been Arthur's counsel since 2002, it is undisputed that Alabama law restricts her presence in the viewing room to being a friend-witness. In this appeal, Arthur does not challenge the constitutionality of Alabama's statute in § 15-18-83.[5]

Notably, Arthur also makes no claim under the Sixth Amendment that he has a right to have legal counsel present in the viewing room during his execution. Therefore, this appeal is only about the narrow issue of whether Arthur has a constitutional right to have his friend-witness have a cell phone (or access to a landline) in the viewing room while witnessing his execution.

On November 2, 2016, Arthur filed in federal district court a § 1983 complaint against ADOC for "violations and threatened violations" of his First and Eighth Amendment rights, based on ADOC's prohibiting witnesses from possessing cell phones in the viewing room during the administration of the three drugs in his scheduled execution. Alabama's prohibition of cell phones for visitors in all prisons has been in effect at least since August 1, 2012. The district court thus dismissed Arthur's § 1983 complaint as barred by the two-year statute of limitations and, alternatively, for failure to state a claim. Arthur appealed, and this Court ordered expedited briefing, which was completed on May 18, 2017 at 3:50 p.m. EST.

To place the statute of limitations issue in context, we review just some of Arthur's litigation history from 1992 to 2017.

## II. ARTHUR'S LITIGATION HISTORY

### A. 1992-2006: Litigation about Arthur's Murder Conviction

This Court has recounted, in multiple previous opinions, the facts underlying Arthur's murder conviction, as well as Arthur's long, 25-year history of litigation in state and federal courts. We will not belabor that history now but, rather, point out only certain dates relevant to the instant appeal.

After his third trial in 1991, Arthur was convicted of the murder of Troy Wicker

---

**5.** Alabama Code § 15-18-83 was promulgated in 1975 and thus has been in place during the entire pendency of Arthur's three capital trials and 25 years of litigation about his death sentence. The district court was correct that, insofar as Arthur's § 1983 complaint perhaps "implicitly" challenged the constitutionality of § 15-18-83, such a § 1983 claim is clearly time-barred. In any event, in this appeal, Arthur does not challenge the constitutionality of § 15-18-83.

and sentenced to death in 1992. See Arthur v. Thomas, 739 F.3d 611, 614-15 (11th Cir. 2014).[6] The Alabama Supreme Court summarized the events giving rise to Arthur's death sentence, which included Arthur being on work release during a life sentence for a prior murder conviction when he killed Troy Wicker:

> Arthur's relationship with his common-law wife ultimately led to his brutally murdering a relative of the woman. Arthur shot the victim in the right eye with a pistol, causing nearly instant death. He was convicted in a 1977 trial and was sentenced to life imprisonment. While on work release during the life sentence, Arthur had an affair with a woman that ultimately led to his brutally murdering that woman's husband, Troy Wicker, in 1982. Arthur shot Wicker in the right eye with a pistol, causing nearly instant death.

Ex parte Arthur, 711 So.2d 1097, 1098 (Ala. 1997).

On direct review, the state appellate courts affirmed Arthur's conviction and sentence. Arthur, 739 F.3d at 616-18. Arthur's state capital conviction became final on June 18, 1998. Id.

After multiple state collateral review cases, the state courts again denied Arthur relief. Id. at 620-21. In 2002, the United States Supreme Court denied Arthur's petition for a writ of certiorari as to his murder conviction and death sentence. Id. at 621.

After Arthur's state collateral petition was dismissed, and while Arthur was appealing that dismissal in the state appellate courts, Arthur filed a federal 28 U.S.C. § 2254 petition raising multiple claims on April 20, 2001—seven days before his first scheduled execution date of April 27, 2001. Id. On April 25, 2001, the federal district court stayed Arthur's execution and his § 2254 proceedings pending exhaustion of state remedies. Id.

Ultimately, the federal district court dismissed Arthur's § 2254 petition. Id. at 621-23. In 2006, this Court affirmed. Id. at 623-24. In January 2007, Arthur petitioned the United States Supreme Court for a writ of certiorari, which the Supreme Court denied. Id. at 624-25.

## B. 2007-2011: Arthur's First Two § 1983 Method-of-Execution Cases

In the years that followed, Alabama's three-drug lethal injection protocol changed as certain drugs became unavailable. Arthur's § 1983 challenges to that lethal injection protocol evolved accordingly. In May 2007, Arthur filed his first § 1983 challenge to the method of his execution, which at that time included sodium thiopental as the first drug. (CM/ECF for the U.S. Dist. Ct. for the S.D. Ala., case no. 1:07-cv-342, docs. 1, 15). The district court dismissed that complaint, and this Court affirmed. Arthur v. Allen, No. 07-0342, 2007 WL 2320069 (S.D. Ala. Aug. 10, 2007), aff'd 248 Fed.Appx. 128 (11th Cir. Sept. 17, 2007) (unpublished). The United States Supreme Court denied Arthur's petition for a writ of certiorari. Arthur v.

---

**6.** During the sentencing phase of Arthur's third trial for his murder of Troy Wicker, Arthur asked the jury to sentence him to death. Arthur, 739 F.3d at 614. Arthur believed that, if sentenced to death, he would enjoy "better prison accommodations, more access to the law library, more time to devote to his appeal, a more extensive appeals process, and—based on his prior experience with the capital appellate process—an increased chance for a third reversal." Id. At trial, Arthur personally addressed the jury to ask for a capital sentence, telling the jury that such a sentence "would give him more time to spend with his children during their prison visits, provide him with a more private cell, and afford him more control over his appeal." Id. at 614-15.

Allen, 553 U.S. 1004, 128 S.Ct. 2048, 170 L.Ed.2d 793 (2008).

In October 2007, Arthur filed a second challenge to Alabama's lethal injection protocol, which the district court again dismissed, and this Court affirmed. Arthur v. Ala. Dep't of Corr., 285 Fed.Appx. 705 (11th Cir. 2008) (unpublished).

### C. 2011-2017: Five-year § 1983 Lawsuit About Many Elements of Alabama's Execution Protocol, Including the First Drug

Arthur's third § 1983 method-of-execution litigation lasted for over five years. In April 2011, Alabama switched the first drug in its lethal injection protocol from sodium thiopental to pentobarbital. See Arthur v. Comm'r, Ala. Dep't of Corr., 840 F.3d 1268, 1275 (11th Cir. 2016). Two months later, Arthur filed a new § 1983 complaint challenging this pentobarbital-based protocol. Id.

In September 2014, Alabama switched to midazolam. Id. at 1276. Arthur twice amended his § 1983 complaint to challenge midazolam and Alabama's execution protocol involving midazolam. Id. at 1275-78. We recount the variety of just some of Arthur's claims in his § 1983 litigation because, notably, Arthur did not raise his current claim for a cell phone (or a landline) in the viewing room during that five-year challenge to Alabama's execution protocol.

After holding a two-day bench trial in January 2016 regarding midazolam, the "pinch test," medical monitoring, and many other § 1983 claims about Alabama's execution procedures, the district court issued two dispositive orders in Arthur's § 1983 case. Id. at 1278, 1283, 1296. In its first order, the district court determined that ADOC was entitled to judgment on Arthur's facial method-of-execution and Equal Protection challenges. Id. at 1283-

86. In its second order, the district court denied relief on Arthur's many as-applied challenges to ADOC's method of execution as applied to Arthur personally. Id. at 1296-98. As a result, in July 2016, the district court entered final judgment on Arthur's § 1983 challenges under the Eighth Amendment, and Arthur timely appealed to our Court in 2016. Id. at 1298.

On November 2, 2016, this Court affirmed the district court's final judgment in Arthur's § 1983 case, rejecting his various challenges to Alabama's execution protocol, including, but not limited to, Alabama's use of midazolam as the first drug in the three-drug lethal injection series and his request for a firing squad to execute him. Id. at 1303-04, 1315-17. After exhaustively reviewing the evidence submitted by both Arthur and ADOC in that § 1983 case, this Court determined, among other things, that the district court had not erred in finding that Arthur had not met his burden of showing that ADOC's midazolam-based lethal injection protocol created a substantial risk of severe pain and violated the Eighth Amendment. Id. at 1303-04.

This Court also rejected Arthur's as-applied Eighth Amendment challenges for several reasons. For example, Arthur's proposed modified lethal injection protocol, which called for extensive monitoring with various pieces of medical equipment, was "light on specifics," and, more importantly, Arthur admitted that the modified protocol would only reduce "to some extent" the possibility of his suffering a heart attack before being sedated. Id. at 1307. Alternatively, we determined that the district court did not err in finding that the opinion of one of Arthur's experts was too speculative and unreliable to be admissible. Id. at 1310-12. Further, Arthur had not met his burden of demonstrating that, as applied to him, Alabama's lethal injec-

tion protocol was "sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers," the showing demanded by the Supreme Court. Id. at 1312 (quoting Glossip v. Gross, 576 U.S. ——, ——, 135 S.Ct. 2726, 2737, 192 L.Ed.2d 761 (2015)).

This Court, in its November 2, 2016 decision, also determined that Arthur's Equal Protection claim—regarding Alabama's performance of the so-called "pinch test" in its execution protocol—was not meritorious. Id. at 1312-14. Based on the record in that case, we rejected Arthur's claim for a firing squad, given that Arthur had not shown either that Alabama's chosen execution method (lethal injection) was sure or likely sure to violate the Eighth Amendment, or that his requested firing squad alternative was a feasible, readily implemented, or significantly safer method of execution. Id. at 1315-17.

On February 21, 2017, the United States Supreme Court denied Arthur's petition for a writ of certiorari in that five-year § 1983 litigation. Arthur v. Dunn, —— U.S. ——, 137 S.Ct. 725, 197 L.Ed.2d 225 (2017). On April 24, 2017, the United States Supreme Court denied Arthur's petition for rehearing. This brings us to the background of ADOC's cell phone policy, which is the subject of Arthur's new and sixth § 1983 case.

### III.  ADOC'S 2012 POLICY PROHIBITING CELL PHONES IN PRISON FACILITIES

As outlined above, Alabama Code § 15-18-83 permits only six relatives or friends to be present in the viewing room during an execution. ADOC's regulations, specifically AR 303, establish ADOC's procedures for all outside visitors coming into the prison. Also included in AR 303 is an annex entitled "Orientation Guidelines for Visitors and Inmates" ("Annex A"). Annex A to AR 303 has a list of "prohibited items" that includes "[e]lectronic equipment to include ... cell phones." Thus, no visitor may take a cell phone into Alabama's Holman Prison, where Arthur is incarcerated and set to be executed.

### IV.  CORRESPONDENCE BETWEEN ADOC AND HAN ABOUT A TELEPHONE IN THE VIEWING ROOM

On October 31, 2016, Han sent a letter to the ADOC Commissioner, requesting to possess her cell phone or have unimpeded access to a telephone "in the viewing chamber" during Arthur's execution. In her October 31, 2016 letter, Han admitted that she knew that ADOC's rules prohibited cell phones in the viewing room, but Han asserted that media exceptions were previously made, and she requested an exception for her, stating:

> I write on behalf of Thomas D. Arthur to respectfully request that you permit me, Suhana Han, counsel to Mr. Arthur, to possess a cell phone or otherwise have unimpeded access to a telephone in the viewing chamber during Mr. Arthur's execution scheduled for November 3, 2016 at 6:00 p.m. CDT. While I understand that the Alabama Department of Corrections ("ADOC") has a general policy against possession of cell phones within its facilities, exceptions to this policy have been made and an exception should be allowed here.... As reported by the media, I understand that other individuals, such as members of the media, are permitted to have cell phones in the viewing chamber.

> . . .

> To accommodate any security or cost-related concerns the ADOC may have, I will purchase a disposable cell phone solely for this purpose at my own expense.... Alternatively, I request that

you please provide a landline or cell phone of your choosing in the viewing room set aside for my use.

(emphasis added). Han copied the Alabama Attorney General's Office and General Counsel for ADOC on her October 31, 2016 letter.

Alabama's Assistant Attorney General (the "State's attorney") responded the same day and denied the request given that, under Alabama law in § 15-18-83, Han was permitted to attend the execution only as a friend-witness and in a non-legal capacity:

I am in receipt of an electronic copy of your October 31, 2016, letter concerning Thomas Arthur's scheduled execution on November 3, 2016. Please note that Thomas Arthur's status as your client does not give you a right to be present at his execution. Pursuant to Code of Alabama § 15-18-83 (1975), in the event Arthur makes such a request, you will be allowed to attend the execution as a witness. This statute permits your presence at a judicially-ordered execution in a non-legal capacity.

In the event Thomas Arthur requests your presence as a witness during his execution, you will be subject to the regulations and rules of the Alabama Department of Corrections while in the Department's facilities. It is my understanding that the Department does not permit visitors to possess cell phones or wireless devices within the correctional facility.

Thus, the State's attorney informed Han that § 15-18-83 gave her permission to attend Arthur's execution only as a witness. And as a witness, Han would be subject to ADOC's regulations, including the rule prohibiting visitors from possessing cell phones within a prison. The State's attorney stressed that, should Arthur designate Han as a witness, and should she attend the execution, "the State will not accept your presence as being in a legal capacity."

On November 1, 2016, the ADOC Commissioner replied to Han's letter. The Commissioner's November 1 letter reads in its entirety:

I received your letter of October 31, 2016, requesting that you be permitted to have a cell phone or otherwise have unimpeded access to a telephone, while you are in the viewing chamber for Thomas D. Arthur's execution on November 3, 2016. As your letter pointed out, the Alabama Department of Corrections does have a policy, prohibiting the use of cellular telephones at any of its facilities by anyone, other than authorized personnel. This prohibition, of course, includes the viewing chamber at Holman Correctional Facility. Any statement you have heard to the contrary, such as your statement, that members of the media have been allowed to have cellular phones in the viewing chamber in the past, is inaccurate. There are no exceptions to this policy.

If Mr. Arthur requests your presence at his execution, your presence in the viewing chamber will be as a friend of Mr. Arthur's and not as his attorney. As explained by Assistant Attorney General James R. Houts, in his letter to you of October 31, 2016, section 15-18-83 of the Alabama Code (1975), permits your presence at a judicially-ordered execution only in a non-legal capacity.

(emphasis added). Thus, the Commissioner similarly stated that, under Alabama law, Han's presence was permitted as a friend-witness in the viewing room and not in her legal capacity. The Commissioner stated that Han's allegation—that the media had been allowed to have cell phones during executions—was inaccurate and that there

was no exception to Alabama's rule prohibiting cell phones of visitors.

## V. ARTHUR'S CURRENT § 1983 CHALLENGE

Subsequently, Arthur filed the instant § 1983 complaint, his sixth § 1983 case. According to Arthur's § 1983 complaint, ADOC's rule prohibiting witnesses' having a cell phone in the viewing room during his execution violates his First Amendment right to meaningful access to the courts. "The purpose of recognizing an access claim is to provide vindication for a separate and distinct right to seek judicial relief," and thus a litigant asserting an access claim must also prove that he has a viable or colorable claim for which he seeks relief. Barbour v. Haley, 471 F.3d 1222, 1225-26 (11th Cir. 2006). In other words, the right to meaningful access to the courts "is ancillary to the underlying claim." Id. at 1226.

As Arthur's underlying claim for which he wants meaningful access to the courts, Arthur alleges that, during the execution, something may go wrong in violation of his Eighth Amendment rights. Arthur wants his witness to have a cell phone in the viewing room itself in order to call a court and make an Eighth Amendment claim during the ongoing execution. Arthur's complaint and appellate briefs are clear that this is a telephone-in-the-viewing-room claim. Indeed, Arthur's complaint refers only to phone access "in the viewing room." Thus, this case before this Court is not about access to a cell phone or to an ADOC landline in other parts of the prison.

In his § 1983 complaint, Arthur claimed that access to the courts was necessary "if something arises during [the] execution that warrants seeking any form of appropriate relief."

Arthur sought injunctive relief and a declaration that AR 303's cell phone prohibition, as applied to his execution with midazolam and as applied to a designated friend-witness in the viewing room, was unconstitutional. Alabama filed a motion to dismiss Arthur's § 1983 complaint.

On April 12, 2017, the district court granted the State's motion to dismiss. As to Alabama Code § 15-18-83, the district court pointed out that § 15-18-83, which governs who may attend executions, permits Han to attend only as a designated friend, not as legal counsel. Further, § 15-18-83, enacted in 1975, was in effect at the time of Arthur's murder conviction in 1982, when his state direct review became final in 1998, throughout his two prior § 1983 complaints in 2007-2011, and during even the litigation of his third § 1983 complaint. Because Arthur's § 1983 complaint was not filed until November 2, 2016, the district court concluded that Arthur's challenge to § 15-18-83 was time-barred.

As to the cell phone prohibition in ADOC's regulations, the district court determined that the applicable two-year statute of limitations began to run from August 1, 2012, the date when the latest version of AR 303 (prohibiting cell phones) became effective. The district court rejected Arthur's contention that his claim did not ripen until October 31, 2016, when Han's letter requested a cell phone, or until November 1, 2016, when ADOC denied Counsel Han's request.

Alternatively, the district court determined that Arthur's instant § 1983 complaint failed to state a plausible claim for relief under Federal Rule of Civil Procedure 12(b)(6). The district court noted the "futility" of a friend-witness (even if a lawyer) in the viewing chamber making a mid-execution call to a judge due to an alleged irregularity in the execution. The district court explained that the witness (who is

not a medical doctor) would be unable to tell the judge (who is also not a medical doctor): (1) what the inmate's irregular movement meant, (2) what drugs had been administered so far or even in what amount, (3) what effect stopping the execution after the injection of one or two drugs would have on the inmate, or (4) whether stopping the execution midstream would cause the inmate pain and suffering or render him comatose. The district court aptly and succinctly explained that:

> The reality is that, once the execution drugs begin to flow, only the warden knows what has been administered, in what amounts, and generally over what time period. Even experienced physicians presented with this scenario likely would be unable to opine as to the immediate or lingering effects on the inmate, or prognosis of an inmate in that circumstance. The result of an interference by a court would, in all likelihood, be cruel and unusual, a fumbling error invited by counsel and, in the end, uncivilized. This court cannot imagine a scenario in which any such interference should be undertaken.[7]

Arthur timely appealed.[8]

## VI. NARROW SCOPE OF THIS APPEAL

Before discussing Arthur's First Amendment access claim and his underlying potential Eighth Amendment claim, we need to point out what is **not** before the Court today. In this appeal, Arthur has **not** made a claim that Alabama Code § 15-18-83—which restricts execution witnesses to relatives or friends of Arthur—is unconstitutional. And Arthur has **not** made a claim that he has a constitutional right under the Sixth Amendment to have his counsel present as a witness in the execution viewing room. Accordingly, we do not address these claims, nor do we address the more general question of whether Arthur retains a right of access to the courts during his execution. Indeed, we proceed under the assumption that he does, and consider only whether, under the particular facts and circumstances of this case, he has said enough to establish the kind of imminent or actual injury necessary for him to perfect his claim.

Importantly for the narrow issue before this Court today, Arthur admits, as he must, that he has litigated for years in federal courts his Eighth Amendment claims that Alabama's three drug lethal injection protocol, both facially and as applied to him because of his medical history, will cause severe pain and cruel and unusual punishment to Arthur. Indeed, the last two years of that litigation involved, _inter alia_, Alabama's use of midazolam as the first drug in its execution protocol. Accordingly, as we consider Arthur's new cell-phone-access claim, we are faced with factual and legal determinations that, as applied to Arthur, Alabama's three-drug execution protocol—including the use of midazolam, the "pinch test," and other aspects of that protocol—do not present a substantial risk of serious imminent harm

7. A filing Arthur submitted in connection with his 2014-2016 midazolam-based § 1983 case states that Alabama's execution protocol "provid[es] that the IV team consist of two 'trained medical professionals' who 'will normally be' EMTs." Thomas Arthur's Statement Regarding the U.S. Supreme Court's Decision in Glossip v. Gross, 576 U.S. ——, 135 S.Ct. at 2732-33, Arthur v. Dunn, 195 F.Supp.3d 1257 (M.D. Ala. 2016) (No. 2:11-cv-438-WKW), ECF No. 245-2.

8. We review the district court's grant of a motion to dismiss _de novo_, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff. Powell v. Thomas, 643 F.3d 1300, 1302 (11th Cir. 2011) (per curiam).

in his execution. See Arthur, 840 F.3d at 1312, cert. denied sub nom. Arthur v. Dunn, — U.S. —, 137 S.Ct. 725, 197 L.Ed.2d 225 (2017).

Therefore, under the particular facts and circumstances of Arthur's cell phone case, this Court is presented with only a narrow issue: whether Alabama's telephone prohibition, as applied to Arthur's May 25, 2017 execution and as applied to Arthur's designated "friend-witness" present in the viewing room only under Alabama Code § 15-18-83, violates Arthur's First Amendment right to meaningful access to the courts. Even before addressing that narrow issue, we must examine the district court's threshold ruling that Arthur's First Amendment cell-phone-viewing-room claim is barred by the statute of limitations.

## VII. THE STATUTE OF LIMITATIONS BARS ARTHUR'S CLAIM

■ The parties agree that Arthur's § 1983 cell-phone-viewing-room claim is subject to a two-year statute of limitations. Powell v. Thomas, 643 F.3d 1300, 1303 (11th Cir. 2011) (per curiam); Ala. Code § 6-2-38. At issue is when that statute of limitations period began to run on Arthur's claim that Alabama's telephone prohibition for his friend-witness in the viewing room violates the First Amendment right of access to the courts to bring a potential underlying Eighth Amendment claim during his execution. While federal courts borrow the statute of limitations period from state law, "the accrual date of a § 1983

cause of action is a question of federal law." Wallace v. Kato, 549 U.S. 384, 388, 127 S.Ct. 1091, 1095, 166 L.Ed.2d 973 (2007). In this Circuit, a federal claim accrues when the plaintiff "knows or has reason to know of the injury which is the basis of the action." McNair v. Allen, 515 F.3d 1168, 1174 (11th Cir. 2008).

### A. Arthur's Claim is Untimely

The procedures and restrictions on witnesses to an execution are arguably a subset of a method-of-execution claim, which means the claim accrued when the capital defendant's direct review was completed or when the capital defendant became subject to a new or substantially changed execution protocol. Gissendaner v. Comm'r, Ga. Dep't of Corr., 779 F.3d 1275, 1280 (11th Cir.) (citing McNair, 515 F.3d at 1174), cert. denied sub nom. Gissendaner v. Bryson, — U.S. —, 135 S.Ct. 1580, 191 L.Ed.2d 661 (2015).

But regardless of whether this claim is best analyzed under the method-of-execution or the access-to-courts framework, the statute of limitations began to run when the ADOC regulation at issue was enacted, because at that point Arthur knew or should have known of the injury for which he seeks relief. See Chappell v. Rich, 340 F.3d 1279, 1283 (11th Cir. 2003) (per curiam) (concluding that the statute of limitations for an access-to-courts claim begins to run "only when the plaintiffs knew or should have known that they have suffered injury to their right of access and who caused it"); McNair, 515 F.3d at 1174.[9]

9. Although Arthur's complaint alleged that ADOC's refusal to allow his counsel access to a telephone in the viewing room violated his Eighth Amendment right to be free from cruel and unusual punishment, he expressly disclaims on appeal the yardstick used to decide the statute of limitations in Eighth Amendment method-of-execution cases. We need not further decide this issue because, under either standard, Arthur's claim is time-barred. See Boyd v. Warden, 856 F.3d 853, 873-76 (11th Cir. 2017) (rejecting method-of-execution claims by death-row inmate for failure to comply with the applicable two-year statute of limitations).

Under that standard, Arthur's cellphone-viewing-room claim is time-barred. Since 2002, Counsel Han has represented Arthur in his federal habeas and § 1983 cases. It is unclear from the record exactly when Alabama implemented its long-standing rule against visitors bringing cell phones into prison facilities, but it was undisputedly in place no later than August 1, 2012. Given Arthur's 2012-2017 litigation about so many aspects of ADOC's rules and protocols, we agree with the district court that August 1, 2012 was the point at which Arthur knew or should have known of the putative injury to his right of access. See Chappell, 340 F.3d at 1283.[10]

Even assuming arguendo that the two-year statute of limitations did not begin to run until ADOC switched to midazolam as the first drug in September 2014, it still expired by November 2016 when Arthur filed this lawsuit.

## B. Section V(C)(2)'s Rule for "Legal/Attorney Visits"

■ We recognize that Arthur asserts that ADOC's separate rule for "Legal/Attorney Visits," found in section V(C)(2) of AR 303, applies. That rule allows attorneys, with approval of the warden, to request "legal visits," to "leave legal documents with an inmate," and to interview an inmate "for legal purposes." AR 303, section V(C)(2)(a)-(e). That rule grants ADOC some discretion to permit attorneys to request permission to have a cell phone in legal visits with their clients. Specifically, section V(C)(2)(f) of AR 303 states, in relevant part:

An attorney may request to bring to a visit electronic equipment, i.e.; laptop, tape recorder, camera; materials needed to complete a psychological evaluation.

... The request will be honored only in very limited, special circumstances, with the advanced approval of the Warden and the ADOC General Counsel.

Arthur claims that the statute of limitations did not begin to run until Han sent her October 31, 2016 letter requesting a cell phone or telephone in the viewing room and ADOC denied the request.

The problem for Arthur is that ADOC's rule for "Legal/Attorney Visits" with their clients, found in section V(C)(2) of AR 303, does not apply to an execution witness in the viewing room under § 15-18-83. Notably, Han did not reference that rule about "Legal/Attorney Visits" in her October 31, 2016 letter request to ADOC.

Furthermore, ADOC Form 303-E is the form an attorney must complete and submit in order to request a "Legal/Attorney Visit" under section V(C)(2) of AR 303. Form 303-E expressly prohibits attorneys from bringing in electronic equipment, including cell phones. Below that prohibition, Form 303-E does have a section entitled "Comment(s) Request(s)" with blank lines where an attorney may request bringing in electronic equipment. Tellingly, Han never completed or submitted this form, which further indicates that no one thought the "Legal/Attorney Visits" rule in section V(C)(2) applied to her presence in the execution viewing room.

---

10. Although Arthur suggests that unnamed "others" were previously permitted to possess cell phones in the execution viewing room, Arthur's allegation appears to be based on nothing more than a newspaper editorial. In his November 1, 2016 letter, the ADOC Commissioner flatly stated that Han's media assertion was "inaccurate" and that that there are no exceptions to the cell phone ban. Arthur has not alleged when these supposed "others" were allowed access to cell phones or who they were. His bare allegation does not make his claim timely.

Given section V(C)(2) of AR 303 and ADOC Form 303-E, ADOC's discretion to permit an electronic device applies only to specified legal interactions between attorneys and their incarcerated clients in the course of providing legal representation in an ongoing manner and not in the context of executions.

Witnessing an execution cannot constitute an "Attorney/Legal Visit" under section V(C)(2) of AR 303 because Alabama law only allows an attorney to attend his or her client's execution in the role of a relative or friend. Ala. Code § 15-18-83. And as set forth above, the separate section V(C)(1) of AR 303, which applies here, does not contain a discretionary exception to the electronics ban for visitors.

Indeed, under Arthur's theory of the limitations period, there would be no relevant statute of limitations for telephone claims like his claim. Under Arthur's theory, a friend-witness or an attorney could wait until a week before the execution, file a request to the warden for a cell phone or landline in the viewing room, have it denied, and then file a timely § 1983 suit about that denial. We are not inclined to ignore the two-year statute of limitations for § 1983 claims in the manner Arthur suggests.

Thus, the district court did not err in determining that Arthur's § 1983 access-to-courts claim based on ADOC's telephone restriction was barred on its face by Alabama's two-year statute of limitations.

## VIII. ARTHUR'S UNREASONABLE DELAY IN BRINGING HIS CELL PHONE CLAIM

■ Arthur's § 1983 complaint seeks injunctive relief, which "is an equitable remedy that is not available as a matter of right." Williams v. Allen, 496 F.3d 1210, 1212 (11th Cir. 2007). In a § 1983 suit by a death-row inmate in Hill v. McDonough,

the United States Supreme Court acknowledged that "a number of federal courts have invoked their equitable powers to dismiss suits they saw as speculative or filed too late in the day." 547 U.S. 573, 584, 126 S.Ct. 2096, 2104, 165 L.Ed.2d 44 (2006) (collecting cases); see also Hallford v. Allen, 576 F.3d 1221, 1222 (11th Cir. 2009) (per curiam) (dismissing a § 1983 action for unreasonable delay); Williams, 496 F.3d at 1214-15 (same). Although it did not address the correctness of those determinations, the United States Supreme Court nevertheless recognized the "significant" problems created when death-row inmates delay in filing their § 1983 suits, stating that "federal courts can and should protect States from dilatory or speculative suits." Hill, 547 U.S. at 585, 126 S.Ct. at 2104.

Additionally, "the equitable principles at issue when inmates facing imminent execution delay in raising their § 1983 ... challenges are equally applicable to requests for both stays and injunctive relief." Grayson v. Allen, 491 F.3d 1318, 1322 (11th Cir. 2007) (citing Rutherford v. McDonough, 466 F.3d 970, 976 (11th Cir. 2006) (affirming dismissal of a § 1983 suit challenging lethal injection based on petitioner's unnecessary delay in filing suit)).

Under these principles, this Court has previously concluded that, where a death-row inmate unreasonably delayed in filing his § 1983 suit, affirmance of the district court's dismissal was warranted. Grayson, 491 F.3d at 1325. Arthur's case shares certain similarities with Grayson. As with Arthur, the State of Alabama had set Grayson's execution numerous times. Further, the underlying factual predicate for the challenge (there, the State's lethal injection protocol and, here, its prohibition on cell phones) was in place for many years before the inmates filed suit. Id. at 1325-26.

In this case, Arthur's § 1983 complaint seeks only equitable relief and was due to be dismissed for unreasonable delay.[11] Arthur's direct and post-conviction appeals concluded almost 15 years ago. His most recent and most lengthy § 1983 case, which challenged Alabama's lethal injection protocols, lasted five and a half years, consisted of multiple claims, involved discovery, and culminated in a two-day bench trial before the federal district court judge in the United States District Court for the Middle District of Alabama. See Arthur, 840 F.3d at 1272. And yet Arthur failed to raise any claim in that litigation concerning ADOC's policy restricting cell phones. Arthur has offered no justification for why he could not have brought this cell-phone § 1983 claim much earlier.

## IX. ARTHUR'S COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR RELIEF

■ Alternatively, Arthur's sixth § 1983 complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). Instead, Arthur offers only conclusory allegations that fail to rise "above the speculative level" and that are thus insufficient to state a plausible claim for relief. Twombly, 550 U.S. at 555, 127 S.Ct. at 1965.

It is well established that "prisoners have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). Prison administrators must ensure

that "inmate access to the courts is adequate, effective, and meaningful." Id. at 822, 97 S.Ct. at 1495. A state "need not literally bar the courthouse door" to violate the right; a violation occurs when the state thwarts an individual's ability to seek a "claim for redress." Chappell, 340 F.3d at 1282. This means that prisoners must be afforded "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Lewis v. Casey, 518 U.S. 343, 351, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996). But Bounds did not create "an abstract, freestanding right;" rather, to state a claim for denial of access to the courts, an inmate must show actual injury. Id. at 351-52, 116 S.Ct. at 2180; see also Barbour, 471 F.3d at 1225-26. "Conclusory allegations of an actual injury are insufficient." Al-Amin v. Smith, 511 F.3d 1317, 1333 (11th Cir. 2008).

Bounds and Lewis both dealt with the adequacy of prison law libraries. In Bounds, the Fourth Circuit concluded that North Carolina's prison-library plan violated the Equal Protection Clause because it denied women the same access to legal research facilities as men with no justification. 430 U.S. at 821, 97 S.Ct. at 1494. North Carolina appealed, and the Supreme Court affirmed, but on other grounds; it held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Id. at 828, 97 S.Ct. 1491, 1494. In Lewis, the Supreme Court reexamined the scope of Bounds, including whether a prisoner must

---

11. While the district court in this case did not dismiss Arthur's § 1983 complaint on unreasonable-delay grounds, we may affirm on any adequate grounds, including grounds different than those on which the district court relied. See Rowe v. Schreiber, 139 F.3d 1381, 1382 n.2 (11th Cir. 1998); see also Crowe v. Donald, 528 F.3d 1290, 1292 (11th Cir. 2008).

show that the inadequacies of a prison library or legal assistance program caused the prisoner to suffer "actual injury." 518 U.S. at 348, 116 S.Ct. at 2178. The Supreme Court concluded "that an inmate alleging a violation of Bounds must show actual injury" or imminent harm. Id. at 349, 116 S.Ct. at 2179. ·

To state a valid right-of-access claim, Arthur must show both that denying his witness access to a phone actually prevents him from accessing the courts and that he will specifically be prevented from bringing a colorable or viable underlying Eighth Amendment claim. The cell phone is "not [an] end[ ] in [itself]," but instead must be "the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." Lewis, 518 U.S. at 351, 116 S.Ct. at 2180. A witness's lack of a cell phone in the viewing room, and concomitant lack of ability to communicate with the court from that room, does not independently qualify as an "actual injury" sufficient to state a claim under Bounds and Lewis because, absent an underlying violation of a fundamental right, no "injury in fact"—and thus no standing—has been shown. See Lujan v. Defs. Of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (laying out the elements of constitutional standing; Lewis, 518 U.S. at 349, 116 S.Ct. at 2179 (explaining that the actual-injury requirement for a right-of-access claim stems from "the doctrine of standing").

In discussing this concept of standing, the United States Supreme Court in Lewis

wrote that "[i]t is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts." Lewis, 518 U.S. at 349, 116 S.Ct. at 2180 (emphasis added). While standing may be based on an imminent injury, that injury must still be concrete and particularized, as opposed to conjectural or hypothetical. See Lujan, 504 U.S. at 560, 112 S.Ct. at 2136. Moreover, the injury must be "likely," as opposed to merely speculative, such that it could be redressed by a favorable decision. Id. at 561, 112 S.Ct. at 2136. While we assume that Arthur retains his constitutional right of access until the completion of any execution, Arthur has not offered anything more than the speculative, conjectural possibility that something might go wrong during his execution which would subject him to cruel and unusual punishment in violation of the Eighth Amendment and that therefore Han must have a cell phone in the viewing room to call a court to present an Eighth Amendment claim.

Arthur attempts to overcome this hurdle by pointing to the allegedly "botched" execution of Ronald Bert Smith in Alabama on December 8, 2016 and by asserting that his execution will be similarly problematic. However, this Court has already determined that Arthur has failed to demonstrate that Alabama's current midazolam-based lethal injection protocol creates an unconstitutionally substantial risk of severe pain, either facially or as applied to him. See Arthur, 840 F.3d at 1303-04, cert. denied —— U.S. ——, 137 S.Ct. 725, 197 L.Ed.2d 225 (2017).[12] And the United

---

**12.** We recognize Arthur also points to the Brooks execution in January 2016, but that occurred prior to the July 19, 2016 final judgment in Arthur's previous midazolam § 1983 case before the federal district court judge in the United States District Court for the Middle District of Alabama.

And as to Brooks's execution, Arthur makes only a conclusory allegation that one eye was open and that this indicated Brooks was not adequately anesthetized. "[T]he fact that Brooks opened one eye during his execution, without more, falls far short of a showing of … a substantial risk of serious pain." Grayson v. Warden, 672 Fed.Appx. 956, 966 (11th

States Supreme Court itself has recognized that midazolam has been repeatedly and successfully used numerous times without any problems as the first drug in a three-drug protocol. See id. at 1304 (citing Glossip, 576 U.S. at ——, 135 S.Ct. at 2734, 2746).

When the Supreme Court decided Glossip at the end of June 2015, Florida had conducted eleven executions using that protocol. Id. Oklahoma had used the protocol twice. Glossip, 576 U.S. at ——, 135 S.Ct. at 2734, 2746. Since Glossip, there have been at least nine executions carried out using midazolam as part of a three-drug protocol in Florida, Alabama, Virginia, and Arkansas. See Death Penalty Information Center, https://deathpenaltyinfo.org/executions-united-states (last visited May 22, 2017) (listing executions in 2015, 2016, and 2017).

Thus, even if we credit Arthur's descriptions of what occurred during the Smith execution, Arthur has not shown that inmate Smith's initial irregular movements were accompanied by, or the result of, unconstitutional pain and suffering—and Arthur has not even come close to showing enough to upset this Court's prior conclusion that Alabama's current midazolam-based lethal injection protocol does not create an unconstitutionally substantial risk of severe pain as applied to him.[13]

---

Cir. 2016) (unpublished) (per curiam). There are insufficient factual details alleged in Arthur's complaint, much less any evidence, about the Brooks execution in this § 1983 case.

This lack of details does not appear to be accidental because a fuller account of Brooks's execution would not help Arthur's case. For example, media reports about Brooks's execution directly contradict Arthur's allegations. See Kent Faulk, Alabama Death Row inmate Christopher Brooks' last minutes, Al.com (Jan. 23, 2016). Brooks's execution lasted about 27 minutes. Id. At approximately 6:11 p.m., the administration of 500 milligrams of midazolam began. Id. "At 6:14 p.m. the chaplain stood up and backed away. Brooks was still and his mouth slightly open, but his chest continued to move up and down." Id. "At 6:17 p.m. the corrections officer ... approached to perform a consciousness test. The officer called out Brooks' name twice, pulled Brooks' left eyelid back, and pinched the backside of Brooks' left arm, all to make sure he was sedated." Id. "By 6:20 Brooks' breathing had become undetectable.... He never appeared to struggle or move." Id. "Prison officials said doctors declared Brooks dead at 6:38 p.m." Id.

13. As to the Smith execution, Arthur filed a declaration of Spencer Hahn, an attorney and a witness to Smith's execution, describing irregular movements by Smith. Notably, Hahn does not state how long those movements lasted or exactly when the first drug was started or completed. Of course, this is be-

cause witnesses do not know when the administration of the first drug begins or ends and thus do not know whether the movements occurred before or after the completion of the first sedative drug.

The State, in its response brief, calls Arthur's characterization of the Smith execution "inaccurate" and points out that, even if the descriptions are true, "the fact that Smith struggled for breath, heaved, coughed, and clenched his fist, without more, falls far short of showing that midazolam 'is sure or very likely to cause serious illness and needless suffering.'" Gray v. McAuliffe, No. 3:16CV982-HEH, 2017 WL 102970, at *12 (E.D. Va. Jan. 10, 2017) (citing Glossip v. Gross, —— U.S. ——, 135 S.Ct. 2726, 2737, 192 L.Ed.2d 761 (2015)).

Smith's execution, if anything, highlights what will undoubtedly be contradictory claims with no medical evidence, if and when a court is called in the middle of an execution. According to one report, Smith's execution lasted 34 minutes, during which "Smith heaved and coughed for about 13 minutes [10:34 to 10:47 p.m.] and underwent two consciousness tests to make sure he couldn't feel pain." Kent Faulk, Alabama Death Row inmate Ronald Bert Smith heaved, coughed for 13 minutes during execution, Al.com (Dec. 8, 2016), http://www.al.com/news/birmingham/index.ssf/2016/12/alabama_death_row_inmate_is_se.html #incart_std. Before the second consciousness test, the heaving and coughing had apparently stopped. Id. That

Quite simply, Arthur has failed to allege a sufficiently imminent underlying. Eighth Amendment injury to support his access-to-courts claim.

Furthermore, Arthur has failed to cite any controlling authority standing for the proposition that visitors to a correctional facility (which is what Counsel Han will be under Alabama law when witnessing his execution) have any independent constitutional right to cell phone or landline access within the prison. Arthur has also failed to cite any binding precedent suggesting that Alabama's policy prohibiting execution witnesses from having cell phone or landline access infringes on the First or Eighth Amendments.[14] There is nothing in this record that suggests we should look past Arthur's failure to allege any actual injury and intrude into a state-administered and judicially-ordered execution in the manner proposed by Arthur.

## X. TURNER FACTORS

Lewis further explained that Bounds "must be read in pari materia" with Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), which held "that a prison regulation impinging on inmates' constitutional rights 'is valid if it is reasonably related to legitimate penological interests.'" Lewis, 518 U.S. at 361, 116 S.Ct. at 2185 (quoting Turner, 482 U.S. at 88, 107 S.Ct. at 2262). The courts thus must "accord adequate deference to the judgment of the prison authorities," especially with inmates in lockdown or other inmates "presenting special disciplinary and security concerns." Id.; see also Hakim v. Hicks, 223 F.3d 1244, 1247 (11th Cir. 2000) (recognizing, in a § 1983 case brought by a death-row prisoner, that the deferential Turner standard differs from "the strict standards of scrutiny applicable to the con-

---

media report also indicates that. Alabama Prison Commissioner Jeff Dunn stated that he did not "see any reaction to the consciousness assessment." Id. In sum, a fuller account of Smith's execution would not help Arthur's case either.

14. We recognize that Arthur cites decisions from two federal district courts. The first decision is McGehee v. Hutchinson, No. 4:17-cv-179, 2017 WL 1381663, at *28-29 (E.D. Ark. Apr. 15, 2017). But the Eighth Circuit, without deciding the access-to-courts issue, later vacated that same district court's related orders granting the inmate stays of execution. McGehee v. Hutchinson, 854 F.3d 488 (8th Cir. 2017).

The other case is Coe v. Bell, 89 F.Supp.2d 962, 966-67 (M.D. Tenn. 2000), vacated as moot due to inmate's execution by Coe v. Bell, 230 F.3d 1357 (6th Cir. 2000) (unpublished). Arthur's reliance on Coe is misplaced because that case is materially different. There, the Tennessee Department of Corrections's rule only permitted an inmate's attorney to visit him or her up to one hour before the time of execution. Coe v. Bell, 89 F.Supp.2d 962, 963 (M.D. Tenn. 2000). Fur-

ther, the Tennessee statute at that time did not even allow the death-sentenced inmate to choose any witnesses. Id. at 963-64, 964 n.3. In light of these restrictions, the district court in Coe held that the inmate had the right (1) to have "some access" to his counsel during the last hour before the execution, and (2) to have his counsel witness the execution from either the witness room or a room with closed-circuit live television transmission. Id. at 967. In light of this holding that the inmate had the right to have counsel present in the room, the district court concluded that counsel could have access to a telephone. Id. Thus, the injunctive relief granted by the district court in Coe was limited to an injunction "prohibiting the Defendant from preventing his counsel from witnessing Plaintiff's execution[.]" Id.

This case does not present the issue in Coe because Han's presence in the execution viewing chamber is permitted under Alabama law as a friend-witness. See Ala. Code § 15-18-83(a)(7). We do not face the issue today of whether that Alabama statute (facially or as applied) violates any constitutional provision or of whether a death-sentenced inmate has a right to have counsel present in the viewing room.

stitutional rights of persons in free society").

The Supreme Court has laid out four factors to "channel the reasonableness inquiry" of Turner: (1) whether there is a "valid, rational connection" between the regulation and a legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the asserted constitutional right that remain open to inmates; (3) whether and to what extent an accommodation of the asserted right will impact the prison and prison staff; and (4) whether the regulation is an "exaggerated response" to prison concerns. Hakim, 223 F.3d at 1247-48 (internal quotation marks omitted).

We need not reach the Turner inquiry in the first instance because, for the reasons explained above, Arthur fails to state a valid right-to-access-the-courts-claim under Bounds and Lewis. But even if we were to reach that issue, it is not at all clear that ADOC's policy prohibiting witnesses to an execution from bringing in their cell phones or having access to a landline in the viewing room would not pass muster under the Turner factors. Indeed, we are dubious of Arthur's suggestion that there is no "legitimate penological justification" for forbidding witness Han from having access to a phone in the viewing room itself.

To begin with, we can think of a couple of "valid, rational connections" to legitimate government interests that might justify this prohibition. ADOC might, for example, believe that a blanket cell phone ban would help protect the privacy of prison officials involved in the administration of the procedure, given the ubiquity of cameras in modern cell phones. Alternately, even though Han offers to have a simple cell phone with no camera, ADOC might be concerned with preserving the solemnity of the execution process. Suffice it to say the policy is not obviously lacking in a "valid, rational connection" to a legitimate interest.

And it is not clear that there is no alternative means of accessing the courts apart from use of a phone within the viewing room itself. Although Arthur summarily concludes that, without access to a phone, his friend-witness would be unable to communicate with the court in the event of a constitutional problem, on this record it has not been shown that Arthur's friend-witness would be unable to simply leave and contact the court once outside the prison.

As to the third factor, the district court cogently suggested that recognizing a right-to-access claim in this context would lead to more potential harm to both the inmate's and the State's interests than good. See Thaddeus-X v. Blatter, 175 F.3d 378, 390 (6th Cir. 1999) (explaining that, in considering an inmate's First Amendment claim, courts must "weigh[ ] the interests of the prison as an institution (in such matters as security and effective operation) with the constitutional rights retained by the inmates"). Arthur's demand would lead to lawyers and judges, non-medically-trained laypeople, attempting to deduce what drugs have been given and in what amounts, the cause of any unusual physical reaction, and the short- and long-term medical effects on the inmate, if any, of stopping an execution midstream. The inevitable outcome of such interference would be prolonged executions and inmates suffering the possibly painful and deleterious effects of starting and stopping the administration of lethal drugs. That lack of expertise, combined with the confusion of a contemporaneous analysis conducted while the protocol is actually being administered, would create a situation ripe for error.

Indeed, these very concerns were showcased during the 2014 execution of Joseph Rudolph Wood—whose execution Arthur cited to in his complaint to show that telephone access can allow attorneys to present contemporaneous Eighth Amendment claims. Arthur did not discuss the events following Wood's counsel's filing of the motion for a stay, but they are instructive.

After the motion was filed, the court held a telephone conference with both Wood's and the government's counsel to determine whether to grant the motion. The transcript of that conference reveals a conversation perfectly in line with what the district court feared in this case. During the discussion of Wood's stay, the court noted that it was "very concerned" that "depending on the accuracy of the information" it had received, "suspending the execution may do more harm than good." Transcript of Telephonic Hearing, Rudolph v. Ryan, No. CV 14-1447-PHX-NVW (D. Ariz. July 23, 2014), ECF 31 at 11-12. And as the execution progressed over the course of the conference, it became less and less clear what action might be appropriate. In response to the court's inquiry into what Wood's counsel would have him do in light of reported changes in Wood's condition, Wood's counsel replied that "when we filed this motion 45 minutes ago when we got word that he was gasping for over an hour, our request was to immediately stay the execution and perform life-saving techniques. I'm not a medical professional. I would still—[the attorney for the state] has said that the situation has changed. Without further information, I'm not sure what more to say other than we're requesting the stay of execution. I'm not sure if it's possible at this time." Id. at 15-16. And ultimately, as the court was preparing to deny the motion for stay, counsel for the state interrupted to inform the judge that Wood's death had been confirmed. Id. at 16. This chain of events illustrates the practical difficulties in managing the competing concerns.

We repeat that Arthur has not raised a Sixth Amendment claim, provided any argument on this point in his brief, or even cited the Sixth Amendment, and therefore we have no occasion to address the matter today. Again, this case is narrowly about only a friend-witness allowed in the viewing room under Alabama Code § 15-18-83.

For all of these reasons, the district court did not err in finding that Arthur failed to state a claim for relief because he did not show that ADOC's policy prohibiting a friend-witness's possessing a cell phone or access to ADOC's landline telephone in the viewing room during the injection of drugs in his execution constitutes a violation of the First or Eighth Amendments.

## XI. CONCLUSION

We recognize the importance of providing all criminal defendants, and especially death-row inmates, the protections of the rule of law and access to courts, but these considerations do not exempt claims (like this telephone-in-the-viewing-room claim) made by death-row inmates from applicable statutes of limitations and the ordinary limitations on equitable relief. Moreover, an access-to-courts claim must be based on an "actual injury." On this record, none has been shown. Thus, we hold that the district court correctly dismissed Arthur's sixth § 1983 complaint as untimely or, alternatively, for failure to state a federal constitutional claim. We affirm.

**AFFIRMED.**

WILSON, Circuit Judge, dissenting:

The Constitution and common sense usually dictate the same result. This case is no exception. An important constitution-

al right is at stake, and Alabama can easily honor that right; all Alabama needs to do is afford Thomas Arthur access to a telephone. Both the Constitution and common sense say Alabama should do just that.

Arthur asked Alabama if one of his designated execution witnesses, his attorney, could have access to a telephone during his execution. Alabama could have easily granted this request. Affording the attorney-witness access to a telephone, such as an already existing landline, would impose no real burden. But Alabama said no. Deprived of access to a telephone, Arthur will be unable to seek legal redress if, during the execution process, Alabama begins to subject him to cruel and unusual punishment. Arthur's right of access to the courts will be thwarted. So, he filed this action, raising an access-to-courts claim.

Arthur is entitled to proceed past the pleadings stage on his access-to-courts claim. The claim is a viable constitutional claim, and it is not time barred.

## I. BACKGROUND

Alabama plans to execute Arthur on May 25, 2017. Arthur's attorney will attend the execution as a witness.[1] In October 2016, Arthur wrote a letter to the Alabama Department of Corrections requesting permission for his attorney to possess a cell phone during the execution or, alternatively, for his attorney to be afforded access to a Department landline during the execution. The Department, in November 2016, denied the request entirely.[2]

Alabama's denial prompted Arthur to immediately file an access-to-courts claim under 42 U.S.C. § 1983 seeking an order that requires Alabama to afford him access to a telephone. According to Arthur, Alabama's refusal to afford him access to a telephone will bar his access to the "courthouse door" if his execution goes awry—a likely possibility, he contends, given that Alabama uses a controversial lethal-injection cocktail and botched at least two recent executions.

The district court dismissed Arthur's case under Rule 12(b)(6) of the Federal Rules of Civil Procedure, finding that his access-to-courts claim is not legally viable and that the claim is barred by the two-year statute of limitations for § 1983 claims arising in Alabama. The court concluded that (1) the claim is not a viable access-to-courts claim because a death row prisoner does not have a right of access to

---

1. The Majority, pointing to Alabama Code § 15-18-83, seems to imply that the attorney's ability to perform legal activities at the execution will be limited. Section 15-18-83 sets forth who may attend an execution. It states that a death row prisoner can designate up to six friends and family members to attend his execution. *See* Ala. Code § 15-18-83(a). If the prisoner wants his attorney to attend his execution, he must use one of his "friend" slots for the attorney. The Majority appears to contend that, because § 15-18-83 requires an attorney to attend an execution in a "friend" slot rather than a designated "attorney" slot, the provision limits the attorney's ability to engage in legal activities. That argument, however, requires us to read an awful lot into the provision. The provision merely lists groups of persons who can witness an execu-

tion; it is silent on the activities that a witness can engage in. *See id.* And if the Alabama legislature intended to ban attorneys from attending executions and engaging in legal activities, it could have easily said that. One reason the legislature did not enact such a ban may be that the ban would have triggered immediate legal challenges.

2. In the Department's denial letter, which Arthur attached to his complaint, the Department explicitly rejected Arthur's request for his attorney to have access to a cell phone but only generally addressed his landline request. The Department was nonetheless clear that Arthur's attorney will be completely barred from accessing a telephone during the execution.

the courts during his execution process and (2) the claim is time barred because the Department has had a policy since 2012 that prohibits prison visitors from possessing cell phones.

## II. STANDARD OF REVIEW

The standard of review in this case is critical. The Supreme Court has discussed the standard for reviewing a Rule 12(b)(6) dismissal at length, providing our court detailed instructions. We must follow the Court's instructions at each step and avoid a mere formulaic recitation of the standard.

We review de novo a Rule 12(b)(6) dismissal, limiting our "consideration to the pleadings and exhibits attached thereto." *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam). We must accept all the plaintiff's allegations as true and construe them "in the light most favorable to the plaintiff." *Lopez v. First Union Nat'l Bank of Fla.*, 129 F.3d 1186, 1189 (11th Cir. 1997). We must also "draw on [our] judicial experience and common sense" and take into account the specific "context" surrounding the allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009); *Roe v. Michelin N. Am., Inc.*, 613 F.3d 1058, 1062 n.5 (11th Cir. 2010) ("[A] district court *must* examine a claim's context and draw on the court's judicial experience and common sense, when evaluating whether a complaint sufficiently pleads a claim . . . ." (internal quotation marks omitted)). If, viewing the plaintiff's allegations through this lens, we conclude that the allegations support a plausible claim for relief, we must reverse the dismissal. *See Iqbal*, 556 U.S. at 678, 129 S.Ct. at 1949.

And in reviewing a Rule 12(b)(6) dismissal based on the statute of limitations, we must reverse unless the plaintiff's pleadings on their face "show that relief is [time] barred." *See Jones v. Bock*, 549 U.S. 199, 215, 127 S.Ct. 910, 920–21, 166 L.Ed.2d 798 (2007); *Grossman*, 225 F.3d at 1231–32 ("A complaint may not be dismissed pursuant to Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." (internal quotation marks omitted)). Affirmative defenses such as the statute of limitations usually must be pleaded and proven by the defendant, so if a question exists as to whether the plaintiff's claim is time barred, dismissal is inappropriate. *See Jones*, 549 U.S. at 215, 127 S.Ct. at 920–21; *Bryant v. Rich*, 530 F.3d 1368, 1379–80 (11th Cir. 2008) (Wilson, J., concurring in part and dissenting in part) ("Our usual practice is to consider affirmative defenses, such as . . . [the] statute of limitations, on summary judgment. . . .").

## III. THE RIGHT OF ACCESS TO THE COURTS

All "prisoners have a constitutional right of access to the courts." *See Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). The right is fundamental, "grounded in the First Amendment, the Article IV Privileges and Immunities Clause, the Fifth Amendment, and/or the Fourteenth Amendment." *Chappell v. Rich*, 340 F.3d 1279, 1282 (11th Cir. 2003) (per curiam); *see also Bounds*, 430 U.S. at 828, 97 S.Ct. at 1498. It protects prisoners from "imminent official interference with [their] presentation of claims to the courts." *Lewis v. Casey*, 518 U.S. 343, 349, 116 S.Ct. 2174, 2179, 135 L.Ed.2d 606 (1996). "[A]ccess to the courts must be more than merely formal; it must also be adequate, effective, and meaningful." *Chappell*, 340 F.3d at 1282. A state "need not literally bar the courthouse door" to violate the right. *Id.* at 1283 (internal quotation marks omitted). Rather, a

state can violate the right by, for example, failing to afford a prisoner who seeks to pursue a constitutional claim access to a law library or some other form of legal assistance. *See Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498.

Of course, the right of access to the courts is not an "abstract, freestanding right to a law library or legal assistance." *Lewis,* 518 U.S. at 351, 116 S.Ct. at 2180. "Meaningful access to the *courts* is the touchstone" of the right. *Id.* at 351, 116 S.Ct. at 2180 (emphasis added). And therefore a prisoner can establish "actual injury" to the right only by showing that the state is impeding his pursuit of an "arguably actionable" constitutional claim. *See id.* at 349–51, 116 S.Ct. at 2179–80.

The "doctrine of standing" requires a prisoner to establish such actual injury. *Id.* at 349, 116 S.Ct. at 2179. The prisoner can satisfy this requirement by showing that the state has already impeded his pursuit of a nonfrivolous claim. *See id.* at 349, 116 S.Ct. at 2179 ("It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts."). Or if the prisoner seeks injunctive relief, he can show that an imminent threat exists that the state will impede his pursuit of a nonfrivolous claim. *See id.* at 349, 116 S.Ct. at 2179. But consistent with general standing principles, the prisoner must show that the threat is "real and immediate." *See Shotz v. Cates,* 256 F.3d 1077, 1081 (11th Cir. 2001) (internal quotation marks omitted); *Cody v. Weber,* 256 F.3d 764, 770 (8th Cir. 2001) ("[T]he actual injury requirement derives ultimately from the doctrine of standing, which directs that courts not get involved unless a constitutional violation has occurred or there is a real and immediate threat of such a violation." (citation omitted)). That means the prisoner must establish a "sufficient likelihood" that he will (1)

suffer harm to his constitutional rights and (2) be thwarted from seeking legal redress for the harm. *See Wooden v. Bd. of Regents of Univ. Sys. of Ga.,* 247 F.3d 1262, 1283 (11th Cir. 2001) ("[T]o have standing to obtain forward-looking relief, a plaintiff must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future."). An imminent threat of the state impeding a constitutional claim exists only if the prisoner establishes both a real and immediate claim and real and immediate interference with the claim.

## IV. THE DISTRICT COURT ERRED IN DISMISSING ARTHUR'S ACCESS-TO-COURTS CLAIM

Arthur asserts that Alabama's refusal to afford him access to a telephone during his execution process imminently threatens his right of access to the courts. Alabama's method of execution, Arthur argues, poses a real and immediate threat of Eighth Amendment harm, but absent access to a telephone, he will be completely denied access to the courts to seek relief from that harm.

Arthur's access-to-courts claim is legally viable and timely.

### A.

The district court erred in finding that Arthur's access-to-courts claim is not legally viable. Death row prisoners have a right to access the courts during the execution process, and Arthur's pleadings establish—at the very least—a plausible claim for access-to-courts relief.

#### 1.

The right of access to the courts is a fundamental right that exists until a death row prisoner's life is taken. The right does not vanish when a prisoner enters the

execution chamber and the state begins to tinker with the machinery of death. *See Jones v. Comm'r, Ga. Dep't of Corrs.*, 812 F.3d 923, 941 (11th Cir. 2016) (Jordan, J., dissenting from denial of rehearing en banc) (" '[A] prisoner under a death sentence remains a living person, and consequently has an interest in his life' that is protected by the Due Process Clause and which entitles him to 'some *minimal* procedural safeguards.' " (quoting *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 288–89, 118 S.Ct. 1244, 1253–54, 140 L.Ed.2d 387 (1998) (O'Connor, J., concurring in part and concurring in the judgment))).

Indeed, this must be the case given that a death row prisoner's Eighth Amendment right not to be subjected to cruel and unusual punishment exists until his life is taken. *See In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 933, 34 L.Ed. 519 (1890) (recognizing that the Eighth Amendment protects individuals from "a lingering death"); *McGehee v. Hutchinson*, No. 17-00179, slip op. at 57, 2017 WL 1381663 (E.D. Ark. Apr. 15, 2017) ("[A prisoner's Eighth Amendment] right[s] attach[ ] until his successful execution." (quoting *Coe v. Bell*, 89 F.Supp.2d 962, 966 (M.D. Tenn.), *vacated as moot by* 230 F.3d 1357 (6th Cir. 2000))). Because the prisoner retains this Eighth Amendment right until his life is taken, he also retains his right of access to the courts. Without the right of access to the courts, the prisoner's Eighth Amendment right would be no right at all. *See McCray v. Sullivan*, 509 F.2d 1332, 1337 (5th Cir. 1975) ("An inmate's right of unfettered access to the courts is as fundamental a right as any other he may hold. All other rights of an inmate are illusory without it." (internal quotation marks omit-

ted)).[3] Without the right of access to the courts, the execution chamber would become a black box shielded from constitutional scrutiny.

**2.**

Arthur's allegations are sufficient to support a claim that Alabama will violate his right of access to the courts during his execution process. He has established imminent actual injury to this right. A sufficient likelihood exists that Arthur will suffer harm to his Eighth Amendment rights during the execution, and there is no question that Alabama, by refusing to afford him access to a telephone, will impede him from seeking legal redress for the harm. *See Lewis*, 518 U.S. at 349–50, 116 S.Ct. at 2179; *Wooden*, 247 F.3d at 1283.

First, Arthur has, at this stage in the proceedings, established a real and immediate Eighth Amendment claim. Taken as true and in the light most favorable to Arthur, his allegations support a plausible inference that he will suffer actionable Eighth Amendment harm during his execution process. Arthur alleges that Alabama's method of execution (lethal injection using midazolam as a sedative) will cause him to suffer "agonizing pain." And in support thereof, he asserts, among other things, that (1) Alabama's reliance on midazolam caused Alabama to botch two recent executions, *see O'Shea v. Littleton*, 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974) ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."); (2) because of his "unique health circumstances," Alabama's lethal-injection cocktail will cause him to suffer a painful heart attack; and (3) he could suffer a "paradoxical reaction to midazolam." Ar-

---

**3.** *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions of the "old Fifth" Circuit handed down prior to the close of business on September 30, 1981 are binding precedent in the Eleventh Circuit).

thur has established a sufficient likelihood that an Eighth Amendment claim will arise during his execution.

Second, Alabama's refusal to afford Arthur access to a telephone will impede his pursuit of that Eighth Amendment claim.[4] The refusal is an "imminent official interference" with Arthur's right of access to the courts. *See Lewis*, 518 U.S. at 349, 116 S.Ct. at 2179. Arthur will have no access to the courts—much less meaningful access— if Alabama bars "telephonic access to the courts," then straps him to a gurney and begins to subject him to a cruel and unusual execution process. *See McGehee*, slip op. at 58–59, 2017 WL 1381663 (holding that a group of death row prisoners, who asserted that Arkansas failed to guarantee "reasonable telephonic access to the courts" during their executions, "sufficiently alleged" an access-to- courts claim). Alabama's refusal to afford Arthur access to a telephone is no different than a hypothetical policy that bars a prisoner in solitary confinement from sending mail. The solitary-confinement prisoner is completely denied access to the courts to raise a claim challenging how his sentence is being carried out. So too is Arthur. Without access to a telephone, Arthur will have no access to the courts to raise a claim challenging how his sentence (his execution) is being carried out. Alabama is plainly interfering with Arthur's right of access to the courts. *See Bounds*, 430 U.S. at 822, 97 S.Ct. at 1495 ("[T]he state ... may not abridge or impair [a prisoner]'s right to apply to a federal court for [constitutional relief.]").

The Majority, however, concludes that Arthur's allegations do not establish imminent actual injury because the allegations do not show a sufficient likelihood that Arthur will suffer Eighth Amendment harm during his execution process. But in so concluding, the Majority fails to adhere to the proper standard of review for Rule 12(b)(6) dismissals—it subjects Arthur to a more rigid standard than is permitted at this stage.

This case is only at the pleadings stage, and Arthur need only offer allegations sufficient to make a *threshold* showing of imminent actual injury. He must simply set forth "general allegations" that, when taken as true and in the light most favorable to him, "suffice[ ] to claim injury ... and hence standing to demand remediation." *See Lewis*, 518 U.S. at 357, 116 S.Ct. at 2183. Yet the Majority takes Arthur's allegations about midazolam and Alabama's two recent executions neither as true nor in the light most favorable to him. The Majority instead engages in factfinding by reviewing websites and newspaper articles and decides that midazolam is not dangerous and that the two recent executions were not botched. *See* Maj. Op. at 909–11 & nn.12, 13. Also, the Majority opines that, because Arthur failed to show in a different proceeding that Alabama's lethal-injection cocktail poses a substantial risk of Eighth Amendment harm, his allegations in this case about the threat of Eighth Amendment harm are inadequate. *See id.* at 31. But here, Arthur need only establish a risk of Eighth Amendment

---

4. Alabama's refusal also puts it at odds with other states. Arizona and Ohio both specifically allow a death row prisoner's attorney to access a telephone during the execution process. *See* Ariz. Dep't of Corrs., DO 710.13(1.5), Dep't Order Manual (2015) ("While the attorney witness is in the witness room, a member of the Witness Escort Team shall hold one mobile phone designated by the attorney, to be made available to the attorney in exigent circumstances."); Ohio Dep't of Rehab. and Corrs., Execution Rule VI(G)(2), Dep't Rules and Regulations (2015) ("If the prisoner chooses to have his or her counsel as a witness, at all times after counsel enters the witness room, counsel shall have free access to the phone near the entrance door of the Death House.").

harm that is sufficient to support standing; he does not need to satisfy the more rigorous burden of showing a substantial risk of harm.

When we follow the Supreme Court's instructions for reviewing Rule 12(b)(6) dismissals, Arthur has alleged more than enough to establish a real and immediate threat of Eighth Amendment harm. We know Arthur will enter Alabama's execution chamber in the coming days. We know Alabama will inject midazolam into him even though, according to Arthur, Alabama botched two recent executions using midazolam. And based on judicial experience, *see Iqbal*, 556 U.S. at 679, 129 S.Ct. at 1950, we know the use of midazolam as a lethal-injection drug has led to botched executions across the country, *see, e.g., Arthur v. Dunn*, 580 U.S. ——, ——, 137 S.Ct. 725, 733, 197 L.Ed.2d 225 (2017) (Sotomayor, J., joined by Breyer, J., dissenting from denial of certiorari) ("Science and experience are now revealing that, at least with respect to midazolam-centered protocols, prisoners executed by lethal injection are suffering horrifying deaths....").

But even if Arthur did not establish that Alabama's method of execution poses a specific threat of Eighth Amendment harm, I would, for practical reasons, find problematic the Majority's rejection of Arthur's claim. Because of the unique circumstances surrounding executions, I do not believe that dismissal of claims like Arthur's based on the actual-injury standing requirement is tenable. Considering the risks inherent to the execution process, I would, even absent the specific threats identified by Arthur, have difficulty concluding that he faces only a "hypothetical" or "conjectural" threat of Eighth Amendment harm and actual injury to his right of access to the courts. *See Shotz*, 256 F.3d at 1081 (internal quotation marks omitted). Moreover, denying Arthur's claim based on actual injury leads to a seemingly paradoxical result. We reject the claim because Arthur has not shown injury to his right of access to the courts, but in doing so, we forever preclude him from bringing a claim—even if his right is injured during his execution process. Denied access to a telephone, Arthur will not be able to access the courts during the execution. And because he will never exit the execution chamber, if his right of access to the courts is injured during the execution, he will never be able to vindicate the right.[5]

**B.**

The district court also erred in finding that Arthur's access-to-courts claim is time barred. Arthur's pleadings do not on their face "show that relief is [time] barred." *See Jones*, 549 U.S. at 215, 127 S.Ct. at 920–21.

In access-to-courts cases, the statute of limitations begins to run "only when the [prisoner] knew or should have known that [he] ha[s] suffered injury to [his] right of access and who caused it." *See Chappell*, 340 F.3d at 1283. Because an actual injury to a prisoner's right of access to the courts does not arise until the state interferes with the prisoner's pursuit of a nonfrivolous claim or until such interference is

---

5. In addition to finding that Arthur has failed to establish actual injury, the Majority avers that Arthur's access-to-courts claim is unavailing because legitimate penological interests support Alabama's decision to deny Arthur access to a telephone. However, I struggle to see how providing access to a telephone, as other states have done, is suffi-

ciently burdensome to justify infringement of a fundamental constitutional right. Further, the record at this time simply does not support dismissal based on this issue of penological interests—whether legitimate penological interests support Alabama's decision to deny Arthur access to a telephone is a fact-intensive question.

imminent, two things must happen before knowledge of an injury can be attributed to the prisoner. *See Lewis*, 518 U.S. at 349–51, 116 S.Ct. at 2179–80. First, the prisoner must suffer some arguably actionable harm to his constitutional rights (or a threat of such harm must develop). Second, the state must impede (or threaten to impede) the prisoner's pursuit of a claim based on the harm.

Arthur's pleadings show neither that he knew nor that he should have known of an actual injury to his right of access to the courts more than two years ago. Far from it. Viewing Arthur's pleadings in the light most favorable to him, the pleadings establish that Alabama did not even begin interfering with access to the courts until 2016.

### 1.

As a threshold matter, Arthur's access-to-courts claim could not have accrued prior to September 2014 because the threat of Eighth Amendment harm underlying his claim could not have begun to develop until then. Arthur asserts that he faces a threat of Eighth Amendment harm during his execution process because Alabama uses midazolam in its lethal-injection cocktail, and Alabama did not begin using midazolam until September 2014. *See Brooks v. Warden*, 810 F.3d 812, 816–17 (11th Cir.), *cert. denied sub nom. Brooks v. Dunn*, — U.S. ——, 136 S.Ct. 979, 193 L.Ed.2d 813 (2016).

The Majority, however, concludes that Arthur's access-to-courts claim arose as far back as 2012. But the claim could not have arisen, and Arthur's statute of limitations could not have started running, until the threat of Eighth Amendment harm underlying his claim developed. Before such harm developed, Arthur had no basis to allege an access-to-courts violation: he had no real and immediate claim that could be impeded. Had Arthur brought an access-to-courts claim without identifying a specific Eighth Amendment threat posed by Alabama's current execution process, Alabama could have sought dismissal based on standing, ripeness, or both.

The Majority fails even to consider this issue of when a threat of Eighth Amendment harm developed. That oversight leads the Majority to reach two irreconcilable conclusions. On the one hand, the Majority concludes that Arthur's access-to-courts claim is time barred—which means a threat of Eighth Amendment harm must have developed more than two years ago. On the other hand, the Majority finds that Arthur has not shown actual injury because he has not established a threat of Eighth Amendment harm. How can that be?

### 2.

Ultimately, however, the issue of when the threat of Eighth Amendment harm arose is irrelevant because Alabama did not even begin interfering with Arthur's access to the courts until 2016.

The district court determined that the Department interfered with Arthur's access to the courts when it enacted its no-cell-phones policy in 2012. Not so. The policy, by itself, does not impede Arthur from pursuing a claim during his execution because it does not completely bar an execution witness's access to a telephone. At most, it bars a witness from possessing a cell phone during the execution—it does not bar access to, for example, a Department landline. In denying Arthur's phone-access request in 2016, the Department for the first time decided that Arthur's attorney could neither possess a cell phone *nor* access a Department landline. Only with that denial did Alabama begin interfering with Arthur's access to the courts; only with that denial did an imminent actual

injury to his right of access to the courts arise.

But even if the no-cell-phones policy could somehow be read as a complete bar to telephone access, Arthur's pleadings would not on their face show that the policy began interfering with his access to the courts more than two years ago. Arthur's complaint and attached exhibits [6] indicate that the policy is, in practice, a discretionary policy and that Alabama did not impose the policy on him until November, 2016. Arthur specifically alleges that the policy is discretionary, and in his October 2016 letter to the Department requesting access to a telephone, he noted that the Department has a record of allowing exceptions to the policy (for example, to members of the media). Also, in a letter responding to Arthur's request, the Alabama Attorney General stated that the *decision* [of whether to grant the request] ultimately rests with the Commissioner of the Alabama Department of Corrections." [7] (emphasis added). These averred facts raise a question of whether the policy is discretionary.[8] And if the policy is indeed discretionary, the policy would not interfered with Arthur's access to the courts until the Department "applied [the] policy" to him—the interference would not have arisen until the Department made the "decision" in 2016 to deny his phone-access request. *See Brown v. Ga. Bd. of Pardons & Paroles*, 335 F.3d 1259, 1261 (11th Cir. 2003) (per curiam).

\* \* \*

As a final note on the issue of timeliness, I find unconvincing the Majority's conclusion that Arthur's access-to-courts claim is subject to dismissal based on unreasonable delay. Arthur did not unreasonably delay filing his claim; he filed it within the statute of limitations period. *See SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 580 U.S. ——, ——, 137 S.Ct. 954, 959, 197 L.Ed.2d 292 (2017) ("Laches . . . cannot be invoked to bar legal relief in the face of a statute of limitations enacted by Congress." (internal quotation marks omitted)). Even more so, Alabama has not shown any prejudice arising from the timing of Arthur's filing. *See Watz v. Zapata Off-Shore Co.*, 500 F.2d 628, 633 (5th Cir. 1974) ("[A]bsence of prejudice . . . will repel a claim of laches.").

## V.  CONCLUSION

Thomas Arthur's right of access to the courts is an important constitutional right. Honoring that right does not require Alabama to do much. Alabama simply has to provide Arthur access to a telephone during his execution.

I respectfully dissent.

**6.** In addition to the Department's November 2016 letter denying Arthur's phone-access request, the attached exhibits include the request itself and a response to the request from the Alabama Attorney General.

**7.** Notably, the Majority, in discussing the Attorney General's response, overlooks this part of the response.

**8.** Cutting against Arthur's "discretionary" argument, the Department, in its November

2016 denial letter, asserted that the no-cell-phones policy is not discretionary. The Majority seems to believe that this statement alone establishes that the policy is not discretionary. *See* Maj. Op. at 906 n.10. It does not. Arthur has set forth allegations that undermine the statement, and those allegations, taken in the light most favorable to him, at the very least support a plausible inference that the policy is discretionary. Dismissal is not appropriate at the pleadings stage simply because the defendant has refuted the plaintiff's allegations.